**In re ALSTOM SA SECURITIES LITIGATION.**

No. 03 Civ. 6595(VM).

United States District Court, S.D. New York.

Sept. 29, 2006.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Deborah Sturman, Eitan Misulovin, Gerald Harlan Silk, Victoria Odette Wilheim, Daniel Lawrence Berger, J. Erik Sanstedt, Bernstein Litowitz Berger & Grossmann LLP, New York City, Geoffrey Coyle Jarvis, Jay W. Eisenhofer, John C, Kairis, Russell D. Paul, Grant & Eisenhofer, PA, Wilmington, DE, Mark Solomon, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Diego, CA, Sidney Stephen Liebesman, Graham, Miller, Neandross, Mullin & Roonan, LLC, New York City, Valerie L. McLaughlin, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA, William S. Lerach, Coughlin, Stoia & Robbins, LLP, San Diego, CA, for Louisiana State Employees' Retirement System, State Universities Retirement System Of Illinois, West Virginia Investment Management Board, Interna-

tional Brotherhood of Electrical Workers, Local 269, Plaintiffs.

George A. Davidson, Hughes Hubbard and Reed, LLP, New York City, for Alstom SA, Pierre Bilger, Patrick Kron, Philippe Jaffre.

Lea Haber Kuck, Robert E. Zimet, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for Jean Pierre Halbron, Serge Tchuruk, Alcatel, SA.

Joanna A. Diakos, Kirkpatrick & Lockhart LLP, New York City, Kenneth Argentieri, Kirkpatrick and Lockhart, Pittsburgh, PA, Thomas R. Johnson, for John Mayo, George Simpson.

Michael C. Miller, Shapiro, Forman, Allen, Miller & McPherson, LLP, New York City, for Stephen Rembaud-Measson.

David H. Kistenbroker, Katten, Muchin, Zavis & Rosenman, Chicago, IL, Julie Pechersky, Katten Muchin Rosenman, LLP, New York City, for Jo Janovek.

### DECISION AND ORDER

MARRERO, District Judge.

This document relates to all actions.

## I. INTRODUCTION

Lead plaintiffs in this class action, the State Universities Retirement System of Illinois ("SURS"), the San Diego City Employees' Retirement System ("San Diego ERS"), the Louisiana State Employees' Retirement System ("Louisiana ERS"), the West Virginia Investment Management Board ("West Virginia IMB"), and the International Brotherhood of Electrical Workers, Local 269 ("IBEW") (collectively, the "Lead Plaintiffs," as representatives for "Plaintiffs") filed a Second Consolidated Amended Complaint for Vio-

lations of the Federal Securities Laws, dated February 24, 2006 (the "SAC"), following this Court's ruling on the various named defendants' initial motions to dismiss the prior Consolidated Amended Complaint for violations of the Federal Securities Laws (the "First Amended Complaint" or the "FAC").[1] That ruling provided Plaintiffs with an opportunity to take limited discovery with respect to one aspect of their original pleadings: the alleged fraud at defendant Alstom S.A.'s ("Alstom") subsidiary, Alstom Transportation Inc. ("ATI"), also a defendant in the action. In the FAC, Plaintiffs claimed that fraud arose out of the understatement of costs related to certain of ATI's contracts (the "ATI Fraud").

The Court found that the Plaintiffs had failed to allege sufficient facts related to the ATI Fraud to state a claim for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act") against defendants Alstom, Alstom USA, Inc. ("Alstom USA"), the former Senior Vice President of ATI, Stephan Rambaud–Measson ("Rambaud–Measson"), and the former Vice President of Finance of ATI, Joseph Janovec ("Janovec") (collectively, "Defendants"). Accordingly, it dismissed those claims. See Alstom III, 406 F.Supp.2d at 506–07. With regard to Plaintiffs' claims for Defendants' violations of Section 20(a) of Exchange Act ("Section 20(a)"), the Court held that while Plaintiffs had alleged that Janovec and Rambaud–Measson had culpably participated in the ATI fraud, there were insufficient allegations of Janovec's and Rambaud–Measson's control of ATI to state a claim for a Section 20(a) violation. See id., at 503–06. Although Plaintiffs did not

---

1. The Court's three prior Decisions and Orders in this matter, setting forth that ruling, and the facts underlying the parties' dispute, familiarity with which is assumed, are reported in In re Alstom SA Sec. Litig., 406 F.Supp.2d 346 (S.D.N.Y.2005) ("Alstom I"), In re Alstom SA Sec. Litig., 406 F.Supp.2d 402 (S.D.N.Y.2005) ("Alstom II"), and In re Alstom SA Sec. Litig., 406 F.Supp.2d 433 (S.D.N.Y.2005) ("Alstom III").

bring claims for Section 20(a) violations for control of ATI against Alstom or Alstom USA in the FAC, they have added these claims in the SAC.

▮ Following this Court's ruling dismissing the preceding claims, prior to filing the SAC, Plaintiffs took three depositions [2] and reviewed documentary evidence related to the alleged ATI fraud. The SAC attempts to cure the previously identified deficiencies in Plaintiffs' claims for Section 10(b) and 20(a) violations against ATI executives Rambaud–Measson and Janovec, but also repleads Section 10(b) and Section 20(a) claims against Alstom and Alstom USA. All four Defendants against whom allegations have been repled in this new complaint have moved to dismiss the SAC, asserting numerous substantive objections. In this decision, the Court addresses Defendants' motions to dismiss the restated claims brought under Section 10(b) and Section 20(a) of the Exchange Act.

## II. BACKGROUND

The background facts of the case will be repeated here only to the extent that they are relevant to Defendants' renewed motions to dismiss.[3]

Plaintiffs contend that Defendants engaged in an alleged fraud which entailed hiding millions of dollars of costs incurred in connection with railcar contracts performed by ATI, in particular a contract to build Comet V train cars for New Jersey Transit ("NJT"), which ATI allegedly intentionally underbid in 1999. (*See* SAC ¶¶ 116–17.) These accounting improprieties resulted in an overstatement of income of Q167 million in Alstom's 2003 accounting statements. (*See id.* ¶ 141.) According to Plaintiffs, after announcing the discovery of the accounting irregularities on June 30, 2003, Alstom initially stated that it would record a Q51 million after-tax charge, but later disclosed that this number was insufficient as the fraud had resulted in an inflation of Q167 million. (*See id.* ¶¶ 140, 148)

The specific statements which are alleged to have been materially misleading to investors are included in a November 5, 2002 Press Release filed with the November 2002 Form 6–K (*see id.* ¶ 327), in the November 2002 Form 6–K itself (*see id.* ¶ 217), and in Alstom's 2003 Annual Report, which was furnished to the SEC on June 2, 2003 on Form 6–K. (*See id.* ¶ 338–39.) Specifically, the November 2002 press release reported that Alstom's Transport Division's ("Alstom Transport"), of which ATI was a part, operating income and operating margin for the first half of

**2.** Specifically, Plaintiffs deposed Rambaud–Measson, Janovec, and Gregory Muscato ("Muscato"), who was designated pursuant to Federal Rule of Civil Procedure 30(b)(6) as the corporate representative for ATI. *See* Deposition of Joe Janovec, dated February 16, 2006 ("Jan.Dep."), attached as Exhibit A to the Affidavit of Leah J. Domitrovic, dated April 10, 2006 ("Domitrovic Aff."); Deposition of Stephan Rambaud–Measson, February 8, 2006, attached as Exhibit B to the Declaration of Geoffrey C. Jarvis, dated May 8, 2006; Deposition of Gregory Muscato, February 15, 2006 ("Muscato Dep."), attached as Exhibit B to Domitrovic Aff. At his deposition, Rambaud–Measson asserted his Fifth Amendment privilege against self-incrimination when asked about his knowledge of ATI's finances and his role in the preparation and dissemination of ATI's financial reports. (SAC ¶¶ 170, 171, and 369.) The Court notes that in evaluating Plaintiffs' claims it may consider these depositions because Plaintiffs have relied upon them in crafting their allegations in the SAC. *See In re Initial Public Offering Sec. Litig.*, 358 F.Supp.2d 189, 205 (S.D.N.Y. 2004); *see also Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000).

**3.** The following paragraphs contain a summary of relevant alleged facts in the SAC, or documents incorporated in the SAC, and in no way represents the factual findings of this Court.

fiscal year 2003 were Q90 million and 3.9 percent, respectively. (*See id.* ¶ 326.) Plaintiffs allege that, in fact, because of the accounting improprieties at ATI, the operating income and margin were artificially inflated by approximately Q167 million. (*See id.* ¶ 327.) The June 2003 Form 6–K is alleged to have been misleading because it reported that, while Alstom had an overall operating loss of Q434 million, Alstom Transport recorded an operating income of Q49 million. (*See id.* ¶ 338.) However, the company's losses were allegedly understated by approximately Q167 million, because of the ATI Fraud. (*See id.* ¶ 339.) In addition, the 2003 Form 6–K was allegedly misleading because Alstom Transport was not, as reported, operating at a profit, but rather had sustained an operating loss of Q118 million. (*See id.*) In the SAC, Plaintiffs have also alleged, for the first time, that statements in a January 16, 2003 press release were materially false and misleading. In particular, Plaintiffs allege that the statement "demand for Transport remains strong" and the nine-month orders and sales figures for Transport were false "because they reflected ATI's underreporting of costs of sales" with regard to the New Jersey Contract. (SAC ¶ 333.) Plaintiffs have also alleged that, by failing to properly disclose the cost overruns, Alstom violated Generally Accepted Accounting Principles ("GAAP"). (*See id.* ¶¶ 214–18.)

As noted above, in *Alstom III*, the Court found that a claim for fraud was stated against ATI on the basis that it had provided, with scienter, overstated financial results to Alstom for incorporation into Alstom's financial results. The Court dismissed the 10(b) claims against Alstom, Alstom USA, Janovec and Rambaud–Measson by reason of the inadequacies of the pleadings with regard to those defendants. Similarly, the Section 20(a) claims against Rambaud–Measson and Janovec were dismissed with leave to replead in relation to the control prong of the alleged Section 20(a) violation. In the SAC, Plaintiffs have made new and more detailed allegations regarding the ATI Fraud and contend that these new allegations support their claims for Sections 10(b) and 20(a) liability against Alstom, Alstom USA, Janovec and Rambaud–Measson.

In particular, Plaintiffs' new allegations focus on the nature of the financial reporting made to Alstom by ATI, and the involvement of Janovec and Rambaud–Measson in gathering, reviewing, and producing the financial data and reports that ATI provided to Alstom. For example, the SAC alleges that "during the class period, Janovec and Rambaud–Measson prepared detailed monthly financial reports regarding ATI's costs and revenues on a contract-by-contract basis," including as related to the NJT Contract. (SAC ¶ 388.) These "monthly management review packages," as they were called by Janovec at his deposition (Jan. Dep. at 18), were provided to certain members of Alstom Transport's management and were discussed in monthly meetings or phone conferences which were attended or participated in by management personnel from both ATI and Alstom Transport, including Alstom's Transport Sector President Michael Moreau ("Moreau") (who reported directly to Alstom's Director and CEO) and Alstom Transport's Chief Financial Officer Roland Kientz ("Kientz"). Janovec testified that the monthly reports were jointly prepared by himself and Rambaud–Measson. (*See* Jan. Dep. at 26.) In order to create the reports, the vice presidents from each of the divisions of Rolling Stock Americas ("RSA"), which was a segment of ATI, would submit monthly reports to Janovec, which Janovec would then consolidate into one monthly report. He then sent the consolidated report to Rambaud–

Measson for his review.[4] (*Id.* at 28–30.) Rambaud–Measson worked with Janovec to finalize the report, by making changes, suggestions or discussing the report with Janovec, and once revisions, which were sometimes substantial, were complete, the report was sent to corporate management at Alstom Transport in Paris. (*Id.* at 28–33.) Janovec was also responsible for submitting additional financial data for RSA, such as a balance sheet and profit and loss statement, to Alstom via a computerized system, referred to by Janovec in his deposition as "Comshare." (*Id.* at 83, 92–93.) This data was generally input into the system by one of Janovec's employees, Chris Connor ("Connor"), though Janovec was ultimately responsible for the report and could direct Connor to make changes if necessary. (*Id.* at 86.) Janovec gener-

ally discussed the Comshare data with Rambaud–Measson before it was submitted to Alstom Management, and on at least one occasion Janovec conducted further investigation into a piece of data pursuant to Rambaud–Measson's review of the data. (*Id.* at 87–89.)

The SAC also contains new allegations with regard to Rambaud–Measson and Janovec's positions and roles at ATI. The SAC alleges that Rambaud–Measson, as the Director and Senior Vice President of ATI, had full profit and loss responsibility for RSA, which was the segment of ATI that managed the NJT Comet V project. (*See* SAC ¶ 155; Jan. Dep at 96.) In addition, it is alleged that Rambaud–Measson was responsible for ATI's financial reports to Alstom, and that Muscato, ATI's corporate representative, identified Ram-

---

4. The parties' filings reflect some confusion regarding the corporate structure of ATI and RSA within it. In its papers, Plaintiffs appear to refer to ATI and RSA interchangeably. However, as is pointed out by Janovec, he testified that RSA was a "segment that was formed in 2002 as a business unit," as part of "a reorganization within Alstom Transport." (Jan. Dep. at 22.) Muscato, testifying as ATI's corporate representative, did not clarify matters, testifying that, among other things: Janovec was an employee of ATI (Muscato Dep. at 10–11); Rambaud–Measson was the Senior Vice President of RSA (*id.* at 25), but that his paycheck was issued through ATI (*id.* at 26); Rambaud–Measson was the "top player" at ATI (*id.* at 57); Janovec was in charge of producing financial statements for RSA and ATI (*id.* at 72); Rambaud–Measson was in charge of reviewing and approving the financial statements prepared by Janovec for both ATI and RSA (*id.* at 73–74); RSA was the functional title for the segment of ATI that operated out of the facility in Hornell, New York (*id.* at 55); and that he could not attest to all of the different legal entities throughout the corporation (*id.* at 23). Thus it is not clear to what extent RSA's functions overlapped with ATI's, or the precise significance of distinguishing between these two entities. The Court will not dwell on this possible discrepancy at this point, as even Janovec's testimony indicates that the Comet V contract, to which a significant portion of the cost overruns at issue here relate, was under the control of RSA and that both Janovec and Rambaud–Measson worked together, at a minimum, to gather, prepare, review and submit financial information for the RSA entity. The Court notes that when Alstom announced losses resulting from the alleged fraud in October of 2003, it cited losses relating to "certain other contracts" (SAC ¶ 151), and it is not clear whether or not those other contracts fell within RSA's or ATI's purview, or both. Given the testimony of Muscato, ATI's corporate representative, that he understood RSA to be the "functional title" for the segment of ATI that operated out of the Hornell facility, the Court will allow the claims to proceed at this point. However, to the extent that, at a later stage in the case and with further discovery, it is demonstrated that the other contracts with regard to which accounting irregularities were identified either do not fall within the purview of RSA during the relevant time period, or that Janovec's and Rambaud–Measson's responsibilities were limited to RSA and not ATI more generally, legitimate questions will arise as to whether Plaintiffs will be able to hold these officers liable for losses caused by any improprieties relating to these other contracts.

baud–Measson as "the major, top player" for ATI. (*Id.* at ¶ 156.) Rambaud–Measson reported directly to Moreau. (*Id.* at ¶ 44.) With regard to Janovec, the SAC alleges that he held the position of Vice President of Finance at ATI, and in this role was in charge of all of ATI's financial reporting. (*Id.* at ¶ 163.) Janovec testified that he reported both to Rambaud–Measson and to Kientz. (*See* SAC ¶ 44, 45.) At his deposition, Janovec indicated that an organizational chart he reviewed in preparation for the deposition indicated a dotted reporting line from himself to Rambaud–Measson and a solid reporting line from himself to Kientz, indicating that Kientz was his direct supervisor. He also referred to Kientz as his "boss." (Jan. Dep. at 76.)

Regarding the ATI cost overruns, Janovec testified that during a December 2002 internal monthly review of all ATI contracts, he noted an issue as to the NJT contract involving cost overruns, meaning that the estimated completion costs for the project exceeded the original project targets. (*See id.* at 57.) Janovec asked an employee to do further research into the overruns issue. The employee's review indicated that there was indeed a very high probability that the project would significantly exceed the originally projected cost targets. According to his testimony, Janovec summarized the employee's findings and provided information on the cost overruns to Rambaud–Measson in January of 2003. (*See id.* at 58–66.) Subsequently, in the course of ATI's normal monthly management reports, Janovec and Rambaud–Measson prepared a report which included the information about the cost overruns for submission to and discussion with their superiors at Alstom Transport. (*See id.* at 67.)

The issue was then discussed during the monthly management review meeting, with the conversation focused primarily on the causes of the cost overruns. Although Kientz was not present in person or on the phone for the meeting, he called Janovec the following day to discuss his review of the slides that were presented at the meeting and the indication in the slides that there were cost overruns on the NJT contract. (*See id.* at 73.) Janovec testified that the monthly meeting at which the cost overruns were first discussed took place in February of 2003,[5] as did the initial phone call from Kientz. (*See id.* at 79.)

Plaintiffs also allege additional facts to support their claims of agency liability on the part of Alstom and Alstom USA, as discussed in more detail in Section VI below.

## III. STANDARD OF REVIEW

In considering a motion under Rule 12(b)(6) to dismiss the complaint for failure to state a claim, the Court should not grant such remedy unless "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000). Moreover, at this stage, the Court construes the complaint liberally, and "must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *SEC v. Pimco Advisors Fund Mgmt., LLC,* 341 F.Supp.2d 454, 463 (S.D.N.Y.2004) (*citing Securities Investor Protection Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 68 (2d Cir.2000)).

---

5. Though the SAC alleges that these discussions first took place in January of 2003 (*see* SAC ¶ 107) and cites Janovec's deposition for this proposition, the Court notes that Janovec testified that he first discussed the overruns with Kientz in February of 2003. (*See id.* at 79.)

A motion to dismiss requires an assessment of the legal feasibility of the complaint, and is not an occasion to "assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir.2004). However, mere conclusions of law or unwarranted deductions need not be accepted by the Court. *See In re La-Branche Sec. Litig.*, 405 F.Supp.2d 333, 347 (S.D.N.Y.2005) (*quoting First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994)).

## IV. SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b–5

### A. LEGAL STANDARD

 When allegations of securities fraud are premised on misleading statements, plaintiffs must plead facts demonstrating a violation of Section 10(b) and Rule 10b–5(b). To state a claim for relief under these provisions, plaintiffs must allege that the defendant "made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000). A plaintiff can establish a strong inference of scienter in two ways: "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). Allegations of motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001) (internal citations omitted). Motives that can be ascribed to "virtually all corporate insiders," or "any publicly owned, for profit endeavor" are not sufficient to support a claim of fraud. *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996). Plaintiffs can demonstrate recklessness by alleging that the defendant knew facts or had access to information suggesting that their public statements were not accurate, or failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud. *See Novak v. Kasaks*, 216 F.3d 300, 308–311 (2d Cir.2000).

 Furthermore, Plaintiffs' pleadings must comport with the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), which requires that "in all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). In addition, plaintiffs alleging securities fraud are also required to satisfy the heightened standard of pleading required by the Private Securities Litigation Reform Act (the "PSLRA"). To satisfy the PSLRA's requirements, Plaintiffs must specify each statement that they contend is misleading and the reason that the statement is misleading, and also particularize pleadings as to scienter. *See* Pub.L. No. 104–67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5).

### B. DISCUSSION

#### 1. Scienter for the ATI Fraud Is Alleged as to Alstom

 In *Alstom III*, the Court determined that Alstom made misleading statements relating to the ATI Fraud in its November 2002 Press Release, its November 2002 Form 6–K, and in its 2003 Annual Report, which was furnished to the SEC on June 2, 2003, twenty-eight days prior to Alstom's June 30, 2003 announcement that it had discovered accounting irregularities

at ATI. *See* 406 F.Supp.2d at 463–64.[6] The Court dismissed the 10(b) claims against Alstom based on these statements after determining that the Complaint failed to allege facts sufficient to demonstrate scienter on the part of Alstom in relation to this fraud. *See id.* at 470–72. Though Plaintiffs argue that the SAC establishes scienter through allegations of motive and opportunity as well as conscious misbehavior and recklessness, the Court will address only the recklessness allegations against Alstom as it finds, based on the new matters pled in the SAC, that they are sufficient to support a finding of Alstom's scienter as to the ATI Fraud.[7]

As discussed above, the SAC makes numerous new allegations regarding Alstom's knowledge of the cost overruns at ATI and sets forth additional details regarding who at Alstom was told about the cost overruns, the means by which financial data was communicated from ATI to Alstom, and the nature of the communications. In the Court's initial assessment of Alstom's scienter with regard to the ATI Fraud, the Court relied largely on the Second Circuit precedent set forth in *Chill*, which found that a parent corporation's failure to investigate further into reports of "success, [or] even the extraordinary success" of one of its subsidiaries whose financial results it had publically reported was not sufficient to allege scienter. 101 F.3d at 270.

*Chill* involved allegations against General Electric ("GE") arising out of a fraud that occurred at one of GE's subsidiaries, the financial firm of Kidder Peabody. A Kidder Peabody employee allegedly conducted a scheme in which he generated false profits by entering non-existent trades into Kidder's computer system in order to inflate his productivity and thus his year-end bonus. The trades were designed to be hidden from Kidder's management and auditors, and resulted in inflated financial results for Kidder Peabody. GE reported the fraudulently inflated financial results of Kidder Peabody to investors in its financial statements. The plaintiffs in that case argued that GE's reporting of the false earnings was highly unreasonable or reckless because GE had failed to investigate the validity of the subsidiary's extremely favorable financial results.

The Second Circuit rejected the plaintiffs' argument, finding that fraud could not "be inferred simply because GE might have been more curious or concerned about the activity at Kidder." In assessing the sufficiency of the allegations in *Alstom III*, this Court found *Chill* to be controlling. *See* 406 F.Supp.2d at 472. In particular, this Court found that the FAC lacked specific allegations that Alstom had sufficient information about the cost overruns or any fraudulent activity to be found reckless in failing to further investigate the financial results reported to it by ATI.[8]

6. As noted above, Plaintiffs also make a new allegation in the SAC that statements in a January 16, 2003 press release was materially false and misleading because they reflected ATI's underreporting of costs of sales with regard to the New Jersey Contract. (SAC ¶ 333.)

7. In taking this course, the Court is mindful of the Second Circuit's guidance that when motive is not established, the "strength of the circumstantial allegations must be correspondingly greater," and holds Plaintiffs to this higher burden. *Kalnit,* 264 F.3d at 142.

8. In particular, the Court found that allegations that sometime after March of 2002, Janovec traveled to Paris to inform Alstom about cost overruns and that ATI's "Project Management Plan" for the NJT project stated that Alstom's Board of Directors had oversight responsibilities for the performance of the contract were too vague to support a finding that Alstom had knowledge of the cost overruns such that it should have known that ATI's financial reports were misleading. With regard to Janovec's alleged trip to Alstom, the Court noted that "there is no allegation as to the extent of the conversation be-

The Court held that the allegations were too vague to demonstrate that Alstom had notice of the nature and extent of overruns at ATI such that Alstom should have known that ATI's favorable financial results were fraudulent. *See id.* The Court noted that "while Alstom arguably may have been negligent in not investigating ATI's results more carefully, this failure is insufficient to support a finding of liability under Section 10(b)." *Id.*

In its current motion to dismiss, Alstom argues that the SAC bears the same deficiencies as the FAC in its lack of specific allegations of scienter. Despite the SAC's allegations that Janovec and Rambaud–Measson met with and discussed the overruns with Kientz and Moreau of Alstom Transport, Alstom again points to *Chill* as controlling, contending that the SAC's allegations as to Alstom's actual knowledge of the potential cost overruns remain too vague to support an inference that Alstom knowingly or recklessly adopted ATI's allegedly false financial results. Contrary to Alstom's arguments, however, *Chill* is no longer analogous to facts of this case as alleged in the pleadings. In *Chill*, the fraud was perpetuated by an individual employee who entered fictitious trades into the company's computer system. The opinion specifically noted that the trades were designed to remain hidden from management. *See* 101 F.3d at 265. Thus, in that case, the plaintiffs' theory of recklessness rested entirely on GE's failure to investigate the unusual profitability and success of its subsidiary.

In *Alstom III*, the Court found this analysis controlling because the FAC failed to allege sufficient specific facts to establish that Alstom had enough information about the cost overruns at ATI to render it highly unreasonable for Alstom to incorporate ATI's positive financial results into its own reports without ensuring that the results were accurate. It was the Court's view that, like the plaintiffs in *Chill*, Plaintiffs here had failed to support a claim of deliberate blindness on the part of Alstom. *See* 406 F.Supp.2d at 472; *Chill*, 101 F.3d at 270.

However, with the additional details alleged by Plaintiffs in the SAC regarding the communications to Alstom about the ATI cost overruns, Plaintiffs' allegations have crossed the line from charges amounting to no more than possible negligent oversight or mismanagement by Alstom to allegations of sufficient scienter to support a claim of fraud. At least as of February of 2003, when Janovec and Rambaud–Measson allegedly presented information about the overruns to members of Alstom Transport's management, and Kientz and Janovec discussed the overruns, Alstom had been directly alerted at its highest corporate levels as to this potentially adverse issue and a reasonable fact finder could conclude that it was reckless for Alstom to report to the public financial results that did not accurately reflect profits in light of the unexpected costs.[9] *See Chill*, 101 F.3d at 269 (noting

tween Janovec and Alstom, the degree of the costs described by Janovec, or who Janovec met with at Alstom." *Alstom III*, 406 F.Supp.2d at 472. In contrast, the SAC contains specific allegations of monthly meetings with Kientz and Moreau, who had direct reporting relationships to the most senior officers of Alstom, in which ATI's results and cost overruns were discussed. Janovec's testimony indicates that the overruns were further discussed in many subsequent phone calls following the February 2003 report. (Jan.

Dep. at 81.) Thus it is alleged that there was an ongoing dialogue as to ATI's results with at least two members of Alstom's management, and that in these meetings, cost overruns were identified as a specific area of concern. Further, the SAC alleges that written reports were given to Kientz and Moreau on a monthly basis.

9. Because the Court finds that scienter is sufficiently alleged only as of February of 2003, there is no scienter asserted as to Alstom for the misleading statements alleged to have

that in some cases "[a]n egregious refusal to see the obvious, or to investigate the doubtful") may give rise to an inference of recklessness (*quoting Goldman v. McMahan. Brafman, Morgan & Co.*, 706 F.Supp. 256, 259 (S.D.N.Y.1989)); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 488 (S.D.N.Y. 2004) ("When a plaintiff has pled facts that indicate the defendant's financial statements were false, the plaintiff must supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged.") (internal citations omitted).

In *Chill*, only the extraordinary profits of the subsidiary could have put the parent on notice of potential fraud. To sustain plaintiffs' claim would have imposed an affirmative obligation on the parent not only to suspect wrongdoing by reason of the reported profits alone, but to undertake investigation into matters that were actually concealed by the misconduct of the employee. Hence, the Second Circuit found that this factual basis was not enough. By contrast, here the parent company was specifically notified of a significant accounting irregularity within its subsidiary that could have had a material effect on the parent's profitability. Though Defendants contend that the additional pleadings and circumstances are still not sufficient to allege scienter because the precise amount of the cost overruns are not alleged, the Court finds that the specific allegations describing the communications between Janovec and Rambaud–Measson with Alstom management with regard to the overruns, including their

providing management with a written presentation as part of monthly reporting that contained information about the cost overruns, present an entirely different situation from the allegations made in *Chill*, and are also far more specific than those asserted in the FAC. *Cf. In re Marsh & McLennan Companies Inc. Sec. Litig.*, No. 04 CV 8144, 2006 WL 2057194, *24 (S.D.N.Y. July 20, 2006) (rejecting parent corporation defendant's claim that *Chill* precluded a finding of scienter on its part because *Chill*, in regard to the parent scienter issue, stood only for the proposition that "parent corporations may not be held liable for reliance on the subsidiary's internal controls," and plaintiffs had alleged far more than the parent's mere reliance on the subsidiaries' internal controls; rather they had alleged the parent corporation's "awareness, reckless disregard, and complicity in the misbehavior [at the subsidiary]").

It is true, as the Defendants contend, that even assuming, as the Court must, that all of the factual allegations of the SAC are true, the precise mechanism of the fraud at ATI is still far from clear. The SAC alleges that there were cost overruns relating to the NJT project, which were discussed with the management of Alstom Transport and by Janovec and Rambaud–Measson. It further alleges that these overruns caused Alstom's financial reports to be materially misleading by overstating profits. The SAC does not allege details explaining the means through which Alstom created its financial reports, or the review process for those reports. It is possible that the litigation

been made prior to that date. While the SAC alleges, as did the FAC, that personnel at ATI were aware of the overruns problems well before that time (indeed, as early as 2000), these allegations are insufficient to satisfy the scienter requirement of a Section 10(b) claim prior to February of 2003 as to Alstom. With

regard to Janovec and Rambaud–Measson, however, these allegations, discussed in *Alstom III*, *see* 406 F.Supp.2d at 504–05, are sufficient to allege scienter as to these two officers. *See* Section IV.B.2, *infra*, for discussion.

will ultimately yield the conclusion that the accounting errors that arose out of ATI's cost overruns were the result of mismanagement rather than fraud.

Nonetheless, Alstom's own language in statements to the public regarding ATI suggest that the company itself came to the conclusion that fraud was the reason for the earnings restatement. In October of 2003, Alstom filed its 2003 20–F form with the SEC, which described the problem at ATI as one of "accounting improprieties." (SAC ¶ 151.) That language was also used in Alstom's initial June 30, 2003 press release announcing its results restatement following an internal review. That press release stated that the "accounting improprieties" included the "non-recognition of costs incurred in anticipation of shifting them to other contracts." (SAC ¶ 139.) Furthermore, in November of 2003, Patrick Kron (the then CEO of Alstom (*see* SAC ¶ 40)) referred to the adjustments made in Alstom's 2003 financial results by stating that: "we had to take into account a fraud (ph) that was discovered in our unit [in] New York." (SAC ¶ 152.)

Taken together, what is alleged is that there were cost overruns that were known of and discussed by ATI and Alstom management prior to the filing of the June 2003 Form 6–K, and that despite this awareness of the overrun irregularities at least as early as February of 2003, Alstom

ultimately had to announce that it would record an after-tax charge of Q167 to account for ATI's, and thus Alstom Transport's, overstated income for Fiscal Year 2003—an adjustment that Alstom's own CEO would later state had to be made because of a fraud that had occurred within the company.[10] (SAC ¶ 140, 152.) Viewing these allegations in the light most favorable to Plaintiffs, the Court cannot conclude that Plaintiffs could prove by a preponderance no set of facts that would involve fraud as an explanation for the misleading financial statement made by Alstom in its June of 2003 6–K. As such, these facts are sufficient to support Plaintiffs' allegations that Alstom knowingly, or at a minimum, recklessly, reported overstated financial results after members of its management had been made specifically aware by the ATI executives most knowledgeable and of highest rank of the issue of ATI's cost overruns. (SAC ¶ 135.) *See Novak*, 216 F.3d at 308 (noting that "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"). This is sufficient to raise a strong inference of conscious misbehavior or recklessness. *See In re Van der Moolen Holding N.V. Securities Litigation*, 405 F.Supp.2d 388, 406 (S.D.N.Y.2005) (noting that recklessness has been alleged when facts which come to a defendant's

---

**10.** In *Alstom III*, the Court noted that "statements by a parent company acknowledging the fraud of a subsidiary after that fraud has been discovered do not, without more, raise any reasonable inference that the parent knew about the fraud in advance and nonetheless proceeded to make the [misleading] statements public." 406 F.Supp.2d at 471. Nonetheless, such a statement does bolster the overall contention that a fraud, as opposed to mere mismanagement, was the cause of the overstatement. Thus the Court points to this statement as among the circum-

stances that raise a strong inference of scienter because it suggests that Alstom, after completing its internal investigation of the ATI fraud, concluded that a fraud, and not negligence or innocent errors, was the cause of the overstated financial results. Because the SAC alleges that Alstom, having been specifically informed of the overruns issue in early 2003, either knew or should have known about the inaccuracies in ATI's financial reports, and still either knowingly or recklessly incorporated ATI's results into its own, a strong inference of recklessness is raised as to Alstom.

attention would place a reasonable party in defendant's position on notice of wrongdoing; and refusing to apply requirement that a "red flag [must] reveal to a defendant all aspects of a given fraud.")

### 2. *Rambaud–Measson and Janovec*

### a. *The SAC Alleges Sufficient New Facts to State a Claim that Rambaud–Measson and Janovec Primarily Liable for the Misleading Statements Issued by Alstom*

■ Rambaud–Measson and Janovec argue that despite the more detailed allegations in the SAC regarding their role in reviewing, revising, consolidating and transmitting the monthly management reports and the Comshare financial information to Alstom, the additional pleadings still fail to allege that they made a misleading statement, as is required for liability under Section 10(b). As this Court discussed at length in *Alstom III*, the Second Circuit has held that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir.1998). This holding followed the Supreme Court's decision in *Central Bank N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which held that under Section 10(b) there is no private right of action against aiders and abettors. Thus, actors who did not definitively make a statement, but rather only assisted or aided in the making of a statement by another person, could not be subject to Section 10(b) liability in a private cause of action. *Wright,* 152 F.3d at 175. In *Alstom III*, this Court analyzed at length both the *Wright* holding and subsequent cases applying that decision in this district, and ultimately found that ATI could be held liable for making a statement in the form of the financial results that it communicated to Alstom, which were al-

legedly consolidated into Alstom's financial results and public filings. The Court reached this conclusion even though ATI did not issue the alleged misleading statements to the public directly. *See Alstom III,* 406 F.Supp.2d at 466–67.

The Court was unwilling at that time, however, to find that Janovec or Rambaud–Measson had made a statement within the meaning of *Wright*. The Court found that the FAC was lacking "specific allegations regarding either Janovec's or Rambaud–Measson's role in the preparation of ATI's financial statements or reports, or alleging that these officers signed any financial reports." *See id.* at 467. The Court further concluded that the FAC did not support a logical inference that Janovec and Rambaud–Measson "were responsible for the drafting, production, reviewing, or dissemination of the information communicated by ATI to Alstom." *Id.*

The SAC remedies many of the failings of the FAC's pleadings identified in *Alstom III*. Indeed, the SAC does state additional facts regarding the roles of both Janovec and Rambaud–Measson in the preparation, production and review of ATI's financial reports, including information related to cost overruns. Specifically, the SAC alleges that these defendants prepared a monthly financial report, which summarized the financial data for current projects, and that Janovec, after receiving the approval and input of Rambaud–Measson, submitted the reports and data to Alstom Transport's management. (SAC ¶ 165, 388.) Janovec's deposition testimony indicates that the reports were compiled primarily by Janovec, but that Rambaud–Measson took an active role in reviewing, editing, and sometimes altering the information. (*See* Jan. Dep. at 28, 31–32.) Furthermore, as is discussed above, the SAC alleges that these two

defendants presented this information to Alstom Transport's management in a monthly management report, which was later discussed at a monthly meeting that would take place either in person or through a teleconference. (SAC ¶ 388.) Janovec's deposition testimony further indicates that he also reviewed and was responsible for the Comshare financial reports, which included data on ATI's profit and loss numbers, and balance sheet and cash flow information for electronic submission to Alstom, and that he generally discussed this information with Rambaud–Measson before it was sent to Alstom management. (Jan Dep. at 87–88, 95–96, SAC ¶ 389.) Given these factual allegations, the Court finds that Plaintiffs have adequately alleged that the roles of these defendants rose to a level of active participation in the dissemination of false or misleading information sufficient to state a claim of primary liability. *See Menkes v. Stolt–Nielsen S.A.,* No. 03 cv 409, 2006 WL 1699603, at *8, 2006 U.S. Dist. LEXIS 42644, at *22 (D. Conn. June 19, 2006) (holding officers of a subsidiary liable where their conduct rose to the level of "active participation in the dissemination of false or misleading information").[11]

The Court notes that two recent district court decisions in this Circuit have similarly concluded that officers of subsidiaries, whose corporate parent, and not the subsidiary, issued statements directly to the public, could be held primarily liable under Section 10(b). *See In re Marsh & McLennan,* 2006 WL 2057194 at *21; *Menkes,* 2006 WL 1699603, at *8, 2006 U.S. Dist. LEXIS 42644, at *22. In *Marsh,* the Court rejected the defendant's claim that group pleading could not extend to the former President and Chief Operating Officer of a subsidiary, as there were allegations demonstrating that the defendant, who had not signed any SEC filings, had "participated in drafting, preparation and/or approval of misstatements, and that [he] controlled the context of the various SEC filings containing misstatements." *See Marsh,* 2006 WL 2057194 at *21.

In *Menkes,* the Court declined to dismiss a Section 10(b) claim against officers of a subsidiary that allegedly had engaged in anti-competitive behavior that rendered the corporate parent's statements regarding its results misleading. *See Menkes,* 2006 WL 1699603, at *8, 2006 U.S. Dist. LEXIS 42644. The Court found that the subsidiary's officers could be held primarily liable as their participation went "well beyond simply enabling or turning a blind eye to" the parents's fraud. *Id.* Rather, the officers were allegedly aware of the anti-competitive behavior long before it was revealed to the public, and they therefore could have disclosed the conduct to the parent and render the parent's statements truthful, "but, at best, they failed to do so, or at worst, they conspired with [the parent] to mask and conceal the improper activities implemented by [the subsidiary] in connection with its antitrust measures." *Menkes,* 2006 WL 1699603, at *8, 2006

---

11. Rambaud–Measson also argued that Plaintiffs have failed to plead causation, because they "do not explain what role Mr. Rambaud–Measson had in connection with the disclosures [that Alstom disseminated to the public], *i.e.,* there is no causal connection between Plaintiffs claimed injury and any alleged actions of Mr. Rambaud–Measson." (Mem. of Law in Support of Def. Stephan Rambaud–Measson's Mot. To Dismiss the Consolidated Second Amended Complaint at 14, dated April 10, 2006.) In essence, this argument is a re-articulation of Rambaud–Measson's argument that he did not make statement. For the reasons outlined above, the Court concludes that Rambaud–Measson did make a statement sufficient for the imposition of primary liability under Section 10(b). In addition, the Court notes that it has already concluded, in *Alstom III,* that Plaintiffs have sufficiently pled causation with regard to the ATI Fraud. *See* 406 F.Supp.2d. at 473–474.

U.S. Dist. LEXIS 42644, at *22. In either instance, the Court concluded, the subsidiary's officers could be held liable because the parent was either a "mere conduit" for the subsidiary to perpetuate the fraud or was a co-conspirator. *Id.*[12]

In the instant case, a reasonable inference can similarly be drawn from the allegations of the SAC that Janovec and Rambaud–Measson were either primarily responsible for the misstatements in ATI's

financial results, or that they agreed with their supervisors, with whom they discussed the cost overruns, to include artificially inflated financial results into Alstom's consolidated financial results for dissemination to investors. As was discussed in Section IV.B.1., it may be too early to discern the precise mechanism of the ATI Fraud theory alleged in the SAC, but the allegations are not so lacking in specificity that dismissal is warranted at the pleadings stage.[13]

**12.** While neither of these cases focuses on the requirement that investors be sufficiently aware of the defendant's participation in the making of the statement to fulfill Rule 10b–5's requirement that the investors have relied on the defendant's misrepresentation, *see In re Global Crossing Sec. Litig.*, 322 F.Supp.2d 319, 343 (S.D.N.Y.2004) (*"Global Crossing I"*), absence of such detailed discussion may reflect these courts' sense that the attribution requirement is of particular concern when plaintiffs seek to hold outside secondary actors—like accountants and auditors (as in *Wright* and *Global Crossing I*)—liable for a corporation's misleading statements, as opposed to inside corporate officers (as in *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir.2001), where the Second Circuit found that a claim had been stated where the statement was not directly attributed to the officer at the time of the dissemination but he had participated in drafting and was in charge of investor relations).

**13.** While the Court concludes that Plaintiffs have alleged sufficient facts to demonstrate Janovec's and Rambaud–Measson's active participation in reporting ATI's financial results to Alstom, it notes that the new allegations of the SAC suggest that the Court's earlier conclusion, in *Alstom III*, that ATI had made a statement for purposes of primary liability, is an even closer question than this Court indicated in that opinion. In *Alstom III*, the Court carefully considered the attribution doctrine as it has developed, and concluded that it would be improper for a subsidiary in ATI's position to be able to report false or misleading financial results to its parent, knowing that the results would be reported to the investing public by the parent, and yet not be held primarily liable for the inaccuracies in those statements. *See id.* However, as

was also noted there, the Court inferred from the allegations of the FAC that ATI had provided Alstom with results which were then directly incorporated by Alstom into its own inaccurate results, then publically reported. *See Alstom III*, 406 F.Supp.2d at 465 n. 28. The SAC's allegations shed new light on the Court's inference, as the new pleading suggest that ATI provided a variety of financial data to Alstom on a periodic basis. At his deposition Janovec testified that he knew that Alstom used the data he provided in computing the corporations financial results, but he was not sure precisely which numbers were used or how. (Jan. Dep. at 92, 105–08.) Thus, a factual question arising from the pleadings is whether the data provided by ATI was in some sense manipulated and computed by Alstom before being reported to the public.

Based on this Court's review, in the majority, if not all, of the other cases in this district in which subsidiaries have been held liable for the financial information they provide to their parent "there [was] no dispute that [the subsidiary] provided [the parent] with financial data on a quarterly basis and that the data was incorporated in [the parent's] financial statements and quarterly and annual reports" and therefore the parent was a "mere conduit" of the particular data. *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 407 (S.D.N.Y.1998); *see also In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 351 (S.D.N.Y.2005) (finding it reasonable to infer that subsidiary's financial data were incorporated directly into parent's public statements regarding earnings in subsidiary's areas of business and finding that statements could be "constructively attributed" to subsidiary); *In re Van der Moolen Holding Sec. Litig.*, 405 F.Supp.2d at 403; *but see In re Sotheby's Hldgs., Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *8 (S.D.N.Y. Aug.

b. *Scienter as to Janovec and Rambaud–Measson*

■ In *Alstom III*, the Court did not directly reach the question of scienter as to Janovec and Rambaud–Measson as it determined that Plaintiffs had failed to plead that these defendants has made a statement for the purposes of Section 10(b) liability. However, in the section of *Alstom III* addressing Plaintiffs' Section 20(a) control liability claims, the Court found that Plaintiffs had sufficiently alleged recklessness on the part of Janovec and Rambaud–Measson, thus fulfilling the culpable participation requirement to support a finding of liability under Section 20(a). *See* 406 F.Supp.2d at 502–06.

In the SAC and in their supporting brief, Plaintiffs argue that the new allegations demonstrate motive and opportunity to commit fraud on the basis of Janovec and Rambaud–Measson's bonus compensation schemes. They also contend that the SAC's more specific allegations as to these officers' roles and functions at ATI further bolster the already sufficient basis identified by the Court in *Alstom III* to draw a strong inference of recklessness or worse on the part of these officers. Both defendants counter that the motive and opportunity allegations are legally insufficient. Further, they claim that the additional discovery taken by Plaintiffs and new allegations in the SAC undermine the Court's earlier finding of scienter in *Alstom III* and instead demonstrate that these officers acted conscientiously in reporting cost overruns to their supervisors.

(i) *The SAC's Allegations Fall Far Short of Demonstrating Motive and Opportunity*

The Court agrees with Janovec and Rambaud–Measson that the SAC's new allegations regarding the structure of their bonus compensation are insufficient to demonstrate motive and opportunity from which a strong inference of scienter is raised. Plaintiffs contend that during the 2003 fiscal year, both Rambaud–Measson and Janovec received incentive based compensation that was tied to ATI meeting certain financial targets which were impacted by ATI's costs. (SAC ¶¶ 370–374.) These allegations are flatly insufficient to demonstrate motive. The Second Circuit has held that bonuses are inadequate as a matter of law to establish motive for the purpose of Section 10(b) liability. *See Kalnit*, 264 F.3d at 139 (stating that "'incentive compensation can hardly be the basis on which an allegation of fraud is predicated.'") (*quoting Acito*, 47 F.3d at 54); *see also In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 353. While there may be cases of extraordinary or unusual executive compensation in which this rule does not hold, *see, e.g., In re Computer Assocs. Class Action Sec. Litig.*, 75 F.Supp.2d 68,

---

31, 2000) (declining to infer, under heightened pleading standard, that parent's public statements relating to subsidiary's area of business were endorsed by the subsidiary). In the instant case, the SAC alleges in numerous places that ATI's financial data was either consolidated, incorporated, or included in Alstom's public statements. (SAC ¶¶ 173, 389, 447.) The relevant factual issue is to what extent Alstom incorporated ATI's results wholesale or substantially readjusted or manipulated them before disclosing them to the public, a matter that is uniquely within Alstom's knowledge. Though still a very close

call, and particularly because the issue arises at the pleadings stage of the litigation at which the Court must draw reasonable inferences and resolve doubts in Plaintiffs' favor, the Court again concludes that the facts pled in the SAC are sufficient in this regard to survive a motion to dismiss. Because the allegations are sufficient to state a claim that ATI made a statement within the meaning of Section 10(b), Janovec and Rambaud–Measson may be held liable for the statements if the evidence establishes their active participation in the preparation and dissemination (to Alstom) of any such statements.

74 (E.D.N.Y.1999), Plaintiffs' SAC pleadings fall far short of meeting any such threshold.

### (ii) *Conscious Misbehavior or Recklessness of Janovec and Rambaud–Measson*

 As is noted above, the Court has already determined, in *Alstom III*, that the facts as alleged in the FAC were sufficient to satisfy the recklessness standard on the part of Janovec and Rambaud–Measson.[14] Specifically, the Court found that the FAC's allegations that the cost overruns regarding the NJT project were widely known of among employees at ATI as early as 2000—and indeed that the employees at ATI were informed of cost overruns of over $40 million dollars in April of 2003, three months before the overruns were disclosed to Alstom's investors—supported a strong inference that Janovec and Rambaud–Measson knew about the cost overruns. The Court concluded that in light of the allegations of "widespread internal knowledge" of the material facts it "would simply be implausible to argue in the face of the evidence presented that [Janovec and Rambaud–Measson] did not know of and in some sense culpably participate[d] in" the fraud. *Alstom III*, 406 F.Supp.2d at 505 (*quoting Global Crossing I*, 322 F.Supp.2d at 350–51). In reaching the conclusion that Janovec and Rambaud–Measson could be found to have been, at a minimum, reckless with regard to the ATI Fraud, the Court also relied on these officers' involuntary suspension by Alstom following outside counsel's investigation into the matter. *See id.* (noting that the suspension more strongly connotes wrongdoing than does a voluntary resignation and pointing to an Alstom press release identifying Janovec and Rambaud–Measson as the two officers who would be suspended pending the completion of an internal review into "accounting improprieties.")

The new additional facts alleged regarding Janovec's and Rambaud–Measson's roles at ATI, including the far greater specificity as to their functions as the most senior financial officer and top executive at ATI, respectively, further bolster the Court's finding in *Alstom III* that sufficient facts have been alleged to support a strong inference of scienter on the part of these defendants. In addition, the SAC alleges that not only were Janovec and Rambaud–Measson suspended pending the internal investigation of the ATI accounting improprieties, but these officers were both ultimately "involuntarily terminated" by Alstom sometime after their initial suspension pending investigation. (SAC ¶¶ 44, 45, 360.)

Janovec and Rambaud–Measson argue, however, that the evidence that came to light during Plaintiffs' discovery regarding these two ATI executives reveals new facts which actually negate any inference of scienter. For example, Janovec argues that the new allegations charge that Janovec acted responsibly and conscientiously with regard to the cost overruns by disclosing the issue to his superiors, Kientz and Rambaud–Measson, as is alleged in the SAC. (SAC ¶ 133, 135.) He argues that in light of these new allegations, it is equally plausible to infer from the facts alleged that he acted without scienter, and in fact that this is the more reasonable inference. As such, Janovec argues, the Court cannot find that Plaintiffs have demonstrated a strong inference of scienter.

---

**14.** That determination was made in the context of the Court's ruling on the Section 20(a) claims against Janovec and Rambaud–Measson. A state of mind of at least recklessness is required to plead culpable participation sufficiently under Section 20(a). *See Alstom III*, 406 F.Supp.2d at 490–91; *In re Livent Sec. Litig.*, 151 F.Supp.2d 371, 417 (S.D.N.Y. 2001).

Rambaud–Measson similarly argues that the new allegations that the overruns were disclosed by Rambaud–Measson and Janovec undermine the Court's prior finding of conscious misbehavior or recklessness. Rambaud–Measson points out that allegations that he formed a task force to monitor the cost overruns situation demonstrate that he made efforts to remedy problems, rather than raising an inference of scienter, as Plaintiffs claim. (*See* SAC ¶¶ 134, 157.) Both defendants also argue that the SAC's allegations and supporting documents reveal that their roles in preparing the financial reports and information submitted to Alstom was limited, and cannot support a finding of scienter, or control.[15] Finally, Janovec and Rambaud–Measson contend that their terminations have not been clearly linked to fraud by Alstom, and that termination following accounting errors can also be the result of perceived mismanagement as opposed to fraud.

The Court agrees with Janovec and Rambaud–Measson that the facts alleged in the SAC are subject to another plausible interpretation: that these defendants did not act with scienter because it was they who reported the overruns to Alstom. However, this theory is sustainable only if the facts asserted in the SAC are read in light most favorable to these defendants, which is not the applicable standard at the motion to dismiss stage. In this regard, the Court's task is to assess the sufficiency of the pleadings, and not to resolve the merits of any material issues of fact or weigh the evidence. In the Court's view, the scienter requirement here does not rest solely on the actions of Janovec and Rambaud–Measson in reporting ATI's cost overruns to Alstom. Very material to that determination is what preceded and came after those disclosures, and how much time elapsed in between—in other words, what the defendants did or did not do both before and after their reports of ATI's financial results which were then incorporated by Alstom into false or misleading public statements about the company's financial results.[16]

---

**15.** Janovec argues that his deposition testimony demonstrates that he was merely a conduit of the various RSA vice presidents' information submitted for the management report, which Janovec simply consolidated and formatted into one presentation. The Court notes that it disagrees with this characterization of Janovec's testimony, which suggests that Janovec, while collecting and consolidating information prepared by other vice presidents, also had responsibility for "[going] to the various units to discuss those results with them, prepare various reports from that, and brief[ing] management on those documents." (Jan. Dep. at 18.) But even accepting Janovec's contention that with regard to the monthly management reports he merely passed on the information of the other vice presidents, his deposition testimony makes clear his own involvement in management and reporting of the cost overruns issue relating to the NJT contract, which is most relevant for the purposes of this opinion.

**16.** Defendants cite case law for the proposition that if equally plausible inferences not involving fraud can be drawn from the facts alleged in the complaint, then the strong inference standard required by the PSLRA and Rule 9(b) is necessarily not met. This argument contends that on a motion to dismiss a claim of fraud, a plaintiff must be held to a higher standard than is normally imposed at the motion to dismiss stage as regards claims not asserting fraud, where the law generally requires that all reasonable inferences be drawn in the non-movant's favor. *See, e.g., Bond Opportunity Fund v. Unilab Corp.,* No. 99 Civ. 11074, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) (finding that the "strong inference" means that plaintiffs are entitled to only the most plausible of competing inferences) (internal citations omitted). This question was briefly discussed by Judge Lynch in *J.P. Morgan Chase Bank v. Winnick,* in which he concluded that while some other Circuits have indicated that this heightened standard may be appropriate, there has been no move in the Second Circuit "away from

208

When evaluating the totality of the facts alleged in the SAC in the light most favorable to Plaintiffs, the Court finds that a strong inference of scienter is raised in that Janovec and Rambaud–Measson knew or should have known that ATI's financial results, which were inaccurately incorporated into Alstom's reports to investors, were misleading because cost overruns at ATI had not been properly accounted for. As discussed above, in addition to the general allegations regarding the widespread awareness at ATI of the cost overruns issue, the SAC now contains new allegations that both Janovec and Rambaud–Measson were constantly provided cost information on the NJT Comet V project as well as other projects. (*See* SAC ¶ 129.) In addition, Plaintiffs also assert new allegations that, at least as of early 2003, both of these defendants were directly involved in the management of the cost overruns issue in relation to the NJT contract, as the SAC alleges that Rambaud–Measson formed a task force on this subject and that Janovec directed an employee to do additional research and investigation into the problem. (*See* SAC ¶¶ 158, 164.) The SAC also states that it was Janovec and Rambaud–Measson who prepared detailed monthly management reports regarding ATI's financial outlook and contracts for submission to Alstom Transport executives. (SAC ¶ 388.)[17]

In addition, as in *Alstom III*, the Court also considers the involuntary suspension, and ultimate termination of these individuals after Alstom's investigation, as well as the incident mentioned above in which the CEO of Alstom subsequently referred to the events leading up to ATI's understatement of costs at ATI as a fraud. While this termination in and of itself would not necessarily support a strong inference of scienter, as one consideration weighed in the totality of circumstances presented, it does provide further reason for the Court to find that the SAC pleads sufficient facts from which a strong inference could reasonably be drawn, that fraudulent intent, and not simple negligence, or—as the defendants would have it—conscientious efforts on the part of Janovec and Rambaud–Measson, were the cause of the understated costs that caused Alstom's financial results to be misleading.

As the Court noted in *Alstom III*, while the cost overruns arising out of ATI's contracts were not, in and of themselves, deceptive, the deliberate non-disclosure of those overruns could give rise to a sufficient inference supporting a reasonable finding of fraud. Plaintiffs have alleged that the cost overruns were known to both Janovec and Rambaud–Measson, and that these individuals were responsible for ATI's financial reporting. Furthermore, it is not disputed that Alstom ultimately had

permitting fraud plaintiffs all reasonable inferences." 406 F.Supp.2d 247, 251 n. 2 (S.D.N.Y.2005). Like Judge Lynch, this Court "finds no contradiction between permitting all reasonable inferences to be drawn in favor of the plaintiff and yet requiring that these inferences of scienter be sufficiently strong to satisfy Rule 9(b)." *Id.*

17. The Court also notes that, with regard to Rambaud–Measson, it is permitted to draw an adverse inference from his invocation of the Fifth Amendment during his deposition in response to questions regarding his knowledge

of ATI's finances and his involvement in the preparation of ATI's financial reports. The Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Parsons & Whittemore Enters. Corp. v. Schwartz*, 387 F.Supp.2d 368, 371–372 (S.D.N.Y.2005) (*quoting Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)); *SEC v. Global Telecom Servs.*, 325 F.Supp.2d 94, 109 (D.Conn.2004). The Court considers this inference among the other factors discussed.

to restate its financial results because these costs had not been properly taken into account in ATI's reported results. Thus, it is clearly alleged that Janovec and Rambaud–Measson knew about the cost overruns, and that they were the individuals responsible for ATI's financial reporting to Alstom. In light of this knowledge, since the pleadings also assert that the information reported to the public did not reflect the overruns, the Court concludes that the allegations, viewed in the light most favorable to Plaintiffs, raise a strong inference that Janovec and Rambaud–Measson either misrepresented this information in ATI's financial reporting to Alstom Transport, or that they agreed with, and acted in concert with, their superiors to misrepresent the information.

### 3. *Alstom USA*

There are no sufficient allegations in the SAC from which the Court could draw a sufficient inference that Alstom USA either had a role in the making of the misleading statements related to the ATI fraud or that this entity had scienter as to this fraud. Thus, Alstom USA can be held liable as a primary violator for the ATI fraud only pursuant to an agency liability or veil-piercing theory. The arguments pertaining to this issue are discussed in Section VI, *infra.*

## V. CONTROL LIABILITY PURSUANT TO SECTION 20(A)

### A. *LEGAL STANDARD*

Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith

and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

 In order to establish a *prima facie* case of liability under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation.'" *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (*quoting SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied,* 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997) (internal quotation marks and citations omitted)); *see also Ganino,* 228 F.3d at 170 (reiterating *First Jersey* standard). In order to plead control, plaintiffs must allege facts demonstrating that the defendants not only had control over the primary violator, but also that they had actual control over the transaction in question. *See Alstom III,* 406 F.Supp.2d at 487.

 Because the Court has already determined, in *Alstom III,* that Plaintiffs have stated a claim for a primary violation against ATI, the first element of the Section 20(a) claim is not at issue. *See id.* at 466–47. In addition, the Court's determinations as to the scienter of Alstom, Janovec and Rambaud–Measson with regard to the ATI Fraud also establish that, as to these parties, the SAC's pleadings contain enough facts to demonstrate that the culpable participation requirement for Section 20(a) liability is sufficiently stated. That standard is "similar to the scienter requirement of Section 10(b), [in that it] requires plaintiffs to plead with particularity facts giving rise to a 'strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engag-

ing in fraudulent conduct.'" *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2006 WL 1628469, at *11 (S.D.N.Y. June 13, 2006) ("*Global Crossing II*") (*quoting Global Crossing I*, 322 F.Supp.2d at 349). Plaintiffs' particularized allegations concerning Janovec's and Rambaud–Measson's involvement in ATI's financial affairs and reporting, and the allegations as to Alstom's knowledge of ATI's cost overruns and reckless disregard for the accuracy of its financial reporting in light of this information, as well as their other allegations of scienter asserted in the SAC, are sufficient for pleading purposes to satisfy the culpable participation test. Thus, the only element of Section 20(a) liability at issue for Janovec, Rambaud–Measson and Alstom is control.

■ Control may be pleaded in accordance with the notice pleading standard prescribed in Federal Rule of Civil Procedure Rule 8(a) ("Rule 8(a)"). Where Rule 8(a)'s pleading standard governs, dismissal is improper as long as the complaint furnishes adequate notice of the basis of the plaintiff's claim (a requirement clearly satisfied here) and "relief could be granted under [some] set of facts consistent with the allegations." *In re Global Crossing*, No. 02 CIV. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005) ("*Global Crossing III*") (*quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)) (internal quotation marks omitted). Thus, applying this standard, even if the specific facts alleged by Plaintiffs, taken alone, would not be enough to establish actual control over the primary violator (ATI and/or Janovec and Rambaud–Measson), "dismissal is improper as long as it is at least plausible that Plaintiffs can develop some set of facts that would pass muster." *Id.*

## B. DISCUSSION

### 1. Plaintiffs Are Permitted to Plead that Both Alstom and Alstom USA, and Janovec and Rambaud–Masson Controlled ATI

■ Defendants argue that because the SAC alleges both that Alstom directed and controlled the fraud, and also that Janovec and Rambaud–Measson controlled the fraud, the pleadings amount to allegations of contradictory fact and for this reason should be dismissed by the Court. Defendants argue that the SAC's pleadings amount to contradictory facts as opposed to alternative theories of the case which are permitted pursuant to Fed. R.Civ.P. 8(e)(2). Defendants are correct in that Plaintiffs do allege that both Janovec and Rambaud–Measson, and Alstom are primarily responsible for the fraud and that each of these parties controlled the transactions at issue. For example, with regard to Janovec's and Rambaud–Measson's control, the SAC alleges that Rambaud–Measson was the "major, the top player" at ATI and that Janovec was "in charge of the entire finance organization at ATI, was the most senior financial person at ATI and was responsible for financial reporting for ATI." (SAC ¶¶ 456, 156.) With regard to Alstom and Alstom USA, the SAC alleges that "Alstom SA actively controlled ATI in its operations and financial reporting, including the improper accounting fo the NJT contract. Similarly, Alstom SA actively controlled Janovec ... in connection with ATI's financial reporting." (*See id.* ¶ 186.) There are a myriad of additional allegations that Alstom controlled ATI as well as its financial reporting. (*See, e.g., id.* ¶¶ 175, 179, 182, 183.)

After careful consideration, however, the Court concludes that these claims may go forward as the permissible pleading of alternate theories of the case at this early stage in the litigation. The law is clear

that a while a party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct, it is permissible for Plaintiffs to pursue both claims at this stage in the litigation. *See, Alstom III,* 406 F.Supp.2d at 493; *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 412–413 (S.D.N.Y.2005) ("As the Federal Rules of Civil Procedure permit the pleading of claims in the alternative, see Fed R. Civ. P. 8(e)(2), Plaintiffs are not precluded from pleading that the Defendants are both primary violators and control persons."); *see also Henry v. Daytop Village,* 42 F.3d 89, 95 (2d Cir.1994) (noting that under Rule 8(e)(2), a plaintiff may plead two or more statements of a claim, regardless of consistency, and also that the inconsistency may lie either in the statement of the facts or in the legal theories adopted) (internal citations omitted).

In the instant case, it is alleged that there was a bifurcated process for the reporting of ATI's financial results: first ATI issued financial reports and information (in the form of monthly financial reports as well as the Comshare information to Alstom), and then Alstom included ATI's financial results in the information it reported to its investors. (*See* SAC ¶ 135.) It remains a factual question at precisely which point in this process the alleged ATI Fraud occurred. In these circumstances,

the Court does not find allegations that both Janovec and Rambaud–Measson and Alstom and Alstom USA controlled ATI's financial reporting to be necessarily contradictory, as the officers could have controlled one stage of this reporting process while the corporate entities controlled the other phase. Alternatively, it may be that either only the officers controlled the transaction causing the fraud or that the corporate entities, Alstom and Alstom USA, were entirely in control. Without knowing the exact numbers reported by ATI to Alstom, and the numbers used by Alstom to generate Alstom's financial reports—both pieces of information that are uniquely within the defendant's purview at this point in the litigation—it is unclear whether Janovec and Rambaud–Measson, or Alstom and ATI, or both sets of parties, controlled the reporting of the fraudulently misleading financial results. As the allegations of the SAC could support any of these alternative theories, the Court does not find them to be so contradictory as to be nonsensical and thus do not warrant dismissal of the claims on this basis.[18]

### 2. Control of ATI, Janovec and Rambaud Measson Is Adequately Alleged as to Alstom

 As noted above, because allegations of control for Section 20(a) need only meet Rule 8's notice pleading stan-

---

**18.** The facts of *Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 979 (E.D.N.Y.1988), cited by Rambaud–Measson in support of his argument that the control person claim against him must be dismissed in light of the SAC's allegations that Alstom "totally controlled" ATI, are not analogous to this case. In *Bernstein,* the court held that one of the defendants, the founder of the corporation, was a control person to such an extent that it precluded other defendants from being found to be control persons. *See id.* That case involved a company that was founded by one individual, whom the company was named after (Eddie Antar), and it was alleged that he

"set all policy for Crazy Eddie, made the most important decisions for the Company, signed filings with the SEC or reviewed and approved reports to shareholders and Company press releases, ... installed his family and friends as the Company's other officers and directors [and] ... dominated and controlled Crazy Eddie at all relevant times." *Id.* This is simply not comparable to the facts of this case, which involves a multinational corporation in which several entities and individuals are alleged to have controlled different aspects of ATI's financial reporting to the public.

dard, even if Plaintiffs allegations would not be enough to establish control, dismissal of a Section 20(a) claim is improper as long as it is at least "plausible that Plaintiffs can develop some set of facts that would pass muster." *Global Crossing III*, 2005 WL 2990646, at *8. The SAC alleges that Alstom, through its senior management, exercised direct supervisory control over Janovec and Rambaud–Measson, through reporting relationships in which Rambaud–Measson reported to Moreau, who reported directly to Alstom's CEO, and Janovec reported to Kientz. (*See* SAC ¶ 179.) It further alleges that Alstom exercised direct control over the selection of ATI's Board of Directors, that it exercised direct control over the financial reporting for ATI and specifically the NJT Contract,[19] and that it ignored ATI's corporate formalities when Kientz informed Janovec of his suspension several days before ATI's board actually formalized the suspension. (*See id.* ¶¶ 180, 183, 185.) Under a notice pleading standard, these allegations are more than sufficient to make it at least plausible that through additional discovery Plaintiffs could develop facts sufficient to demonstrate that Alstom controlled Janovec, Rambaud–Measson and ATI.

### 3. *Plaintiffs Have Adequately Alleged that Janovec and Rambaud–Measson Controlled ATI*

Plaintiffs also allege facts sufficient to support a finding of control of ATI by Janovec and Rambaud–Measson.

The SAC alleges that Rambaud–Measson was the most senior executive at ATI and also that he was responsible for ATI's financial reports to Alstom. (*See id.* ¶¶ 155–156.) In addition, it is alleged that Rambaud–Measson created a task force of ATI employees to specifically evaluate and address the NJT Contract cost overruns situation, indicating his control over this particular reporting issue. (*See id.* ¶ 158.) As to Janovec, the SAC alleges that he was the most senior finance executive at ATI, and also had specific control as to the NJT contract cost overruns question, as demonstrated by him assigning another ATI employee to investigate into the overruns issue. (*See id.* ¶¶ 163–164.) Janovec was also responsible for the internal controls that were in place to assure the accuracy of the financial information reported by Rolling Stock America Units, within which the management of the Comet V contract fell. (*See id.* ¶ 164.) The allegations as to both of these defendants are far more specific than those in the FAC, and are also sufficient to meet the Rule 8 notice pleading threshold.

### 4. *Alstom USA*

There are no sufficient allegations from which the Court could infer that Alstom USA culpably participated in the ATI Fraud. Thus, Alstom USA can be held liable as a primary violator for the ATI fraud only pursuant to an agency liability or veil-piercing analysis. The arguments

19. Specifically, the SAC alleges that, as is discussed in Janovec's deposition testimony, on at least one occasion, Kientz instructed Janovec to accelerate the recognition of revenue on the NJT contract, contrary to Alstom's internal procedure and internal accounting practice regarding revenue recognition. (*See id.* ¶ 183.) In its brief, Alstom points out that this incident occurred in the 2004 fiscal year and thus would not have affected the losses alleged here, and also that the issue involved revenue that was recognized by Alstom's Brazilian subsidiary, not ATI. (*See* Mem. of Law in Supp. of Alstom's and Alstom USA's Mot. to Dismiss Plaintiffs Second Consolidated Am. Compl., dated April 10, 2006, at 11 n. 5) Nonetheless, this instance does demonstrate a relationship in which Kientz had control to direct the actions of Janovec, even if it may not bolster any allegations as to Alstom's scienter for Plaintiffs' Section 10(b) claim.

pertaining to this issue are discussed in Section VI, *infra.*

## VI. LIABILITY OF ALSTOM USA PURSUANT TO A VIEL PIERCING ANALYSIS

 In *Alstom III*, the Court briefly addressed Plaintiffs' claim that Alstom USA was liable for the ATI Fraud because ATI was its agent. The Court concluded that this claim had not been sufficiently pled to meet the Rule 8 notice pleading standard that is required for pleading an agency relationship. *See* 406 F.Supp.2d at 469. However, the Court noted that under federal securities laws, principals may be held liable for the acts of their agents. *See id.* at 468 (*citing In re Parmalat Sec. Litig.*, 375 F.Supp.2d at 290).

In the SAC, Plaintiffs allege that both Alstom and Alstom USA should be held liable for the ATI fraud under a respondeat superior or agency theory. (*See* SAC ¶¶ 175–76.) Alstom and Alstom USA contend that, as a matter of law, agency principles have not and should not be applied to hold a parent liable for the securities fraud of its subsidiary. In support of this contention, Alstom and Alstom USA argue that such a proposition would represent a novel use of common law agency principles because it would problematically allow Plaintiffs to sidestep the individualized inquiry into the parent corporation's scienter required by the Second Circuit as set forth in *Chill*, 101 F.3d 263, and also because the imposition of liability under agency principles would conflict with Section 20(a), which sets forth a specific mechanism to demonstrate the controlling person relationship sufficient to establish liability. They further argue that even if such agency principles were applicable, Plaintiffs have not pled sufficient facts to establish an agency relationship between Alstom and Alstom USA and ATI.

In support of their claims, Plaintiffs have alleged, with regard to Alstom, that: it owned all of the stock in Alstom USA, which in turn wholly owned ATI (*see* SAC ¶ 175); Alstom exercised direct control over the operations and financial reporting of ATI, including reporting as to the NJT Contract, and did not treat ATI as a separate self-managed corporation (*see id.* ¶¶ 179, 183, 186); Alstom exercised direct control over the ATI board of directors (*see id.* ¶ 180); ATI disregarded corporate formalities when the ATI Board, following the disclosure of the fraud, executed a consent of directors dated July 1, 2003 (days after Janovec had already been notified of his suspension by Kientz) reciting that the Board members were the only directors and suspending Janovec and Rambaud–Measson, ignoring that Rambaud–Measson was also a director of ATI (*see id.* ¶ 185). With regard to Alstom USA, the SAC alleges that throughout the class period, "Alstom USA . . . was a wholly owned subsidiary of Alstom SA that owned all of ATI's stock, elected all of its directors, and selected all of its officers." (SAC ¶ 175.) It further alleges that according to a former officer of Alstom USA, "the same officers who ran ATI were also the officers of Alstom USA," and that Alstom USA "through its control over ATI, Janovec, and Rambaud–Measson, caused ATI, Janovec and Rambaud–Measson to carry out the improper accounting for the Comet V Contract." (*Id.*)

 The Court, having considered the allegations and the arguments of the parties, finds that the facts pled in the SAC, when viewed in the light most favorable to Plaintiffs, allege a veil-piercing theory of liability. Though the parties' arguments focus on the applicability of respondeat superior and agency liability, in the Court's view the allegations of domination and control of ATI by Alstom and Alstom

USA more coherently allege that these parties should be held liable for the ATI Fraud as the alter egos of ATI.[20] The Court is not constricted to consider only the labels or legal theories that Plaintiffs have put on a claim; what is important is the substance of the claim and what cognizable legal theory it actually states. *See* James Wm. Moore, et al., *Moore's Federal Practice*, § 8.04 (3d. ed. 1997) ("Rule 8(a)(2) does not require a claimant to set forth any legal theory justifying the relief sought on the facts alleged, but does require sufficient factual averments to show that the claimant may be entitled to some relief."); *see also Newman v. Silver*, 713 F.2d 14, 16 (2d Cir.1983) ("Silver's brief on appeal argues that the district court tried the case on a quantum meruit basis although quantum meruit was not mentioned in the complaint. But he misconceives the nature of federal pleading which is by statement of claim, not by legal theories."); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir.1992) (noting prior Seventh

Circuit holding that a complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations) (internal citation omitted).

Thus, while the Court is mindful that the parties have considered Plaintiffs' claims only in the context of a claim for liability pursuant to respondeat superior or agency,[21] because "all complaints must be read liberally" and "dismissal on the pleadings never is warranted unless the plaintiff's allegations are doomed to fail under any available legal theory," the Court will allow plaintiffs' claims against Alstom and Alstom USA to proceed at this stage despite Plaintiffs' failure to identify in the SAC their claim of veil-piercing liability by name. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir.2005); *see also Marbury Management*, 629 F.2d at 712 ("Generally a complaint that gives full notice of the cir-

**20.** The two cases most discussed by the parties in their briefing on the respondeat superior/agency issue are easily distinguishable from the case at hand and demonstrate that, with regard to the facts alleged in the SAC, a veil-piercing analysis is more appropriate. Plaintiffs point to *Marbury Mgmt. Inc. v. Kohn*, 629 F.2d 705 (2d Cir.1980), for example, in support of their contention that respondeat superior is applicable in the securities law context. While *Marbury* did approve the applicability of a respondeat superior theory in that case, the underlying facts there involved an attempt to hold a brokerage house liable for losses caused by its employee. In *Global Crossing III*, cited by both parties in support of their arguments, Judge Lynch considered whether or not a respondeat superior theory of liability could be applied to hold accountable a corporation for the actions of its employees in their capacities as independent directors sitting on the board of a different corporation. *See id.*, 2005 WL 2990646, at *6. Plaintiffs cite this case to further support of the applicability of respondeat superior theory in the securities law context, while

Alstom and Alstom USA point to the decision in support of their argument that respondeat superior should not be extended to novel and expansive applications in the securities law context, such as to hold a corporate parent liable for the actions of its subsidiary. In the Court's view, both parties' arguments miss the mark, in that the actions of an employee are not at issue here. ATI is not the employee of Alstom USA or Alstom, nor are Janovec and Rambaud–Measson. Respondeat superior is a common law doctrine through which an employer may be held liable for the tortious acts of an employee committed within the scope of his employment. *See id.*, at *5 (citing *Marbury Mgmt.*, 629 F.2d at 716).

**21.** Indeed, Alstom USA notes in its reply brief that it "reads the SAC as only asserting a Section 10(b) claim against it on the basic principles of respondeat superior." (Reply Mem. of Law in Supp. of Alstom's and Alstom USA's Mot. to Dismiss Plaintiffs Second Consolidated Am. Compl., dated May 22, 2006, at 7 n. 7.)

cumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim."); *De-Marco v. Nat'l Collector's Mint, Inc.*, 229 F.R.D. 73, 76 (S.D.N.Y.2005); *Stolow v. Greg Manning Auctions, Inc.*, 258 F.Supp.2d 236, 242 (S.D.N.Y.2003) (noting that a complaint need not state the legal theory underlying the claim in most instances).

 In New York, to pierce the corporate veil, plaintiffs must generally show two things: "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked, and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *See Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F.Supp.2d 609, 614 n. 8 (S.D.N.Y.2003) (*quoting Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993)).[22] Factors to be considered in the determination of control or domination sufficient to pierce the veil include: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence ... (2) inadequate capitalization, ... (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, [and] (7) whether the related corporations deal with the dominated corporation at arms length....".

*Network Enters. v. APBA Offshore Prods.*, 01 Civ. 11765, 2002 WL 31050846 at *3 (S.D.N.Y. September 12, 2002) (*quoting Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.1991)). Furthermore, in light of the breadth of factors that inform the decision, the Second Circuit has emphasized that the determination of whether to pierce the corporate veil is a "fact specific inquiry." *Id.* (*quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Group*, 268 F.3d 58, 63 (2d Cir.2001)).

The proper pleading standard for a claim of alter ego liability has been a "knotty question" in this district. *In re Parmalat Sec. Litig.*, 375 F.Supp.2d at 292 (internal citations omitted). However, as was outlined in *Parmalat*, which also addressed veil-piercing in the context of a securities claim, in such cases "the fraud allegations therefore are governed by Rule 9(b) and the PSLRA," while "the domination and control elements of the claim ... need comply only with Rule 8." *Id.*; *see also Sofi Classic S.A. DE C.V. v. Hurowitz*, 05 Civ 9986, 2006 WL 2266302 at *6 (S.D.N.Y. August 7, 2006) ("[A]llegations of dominance and control ... are not subject to the heightened pleading standard, even where the veil-piercing claim is based on an allegation that the corporate form was abused to perpetrate fraud.").

Plaintiffs' allegations as to both Alstom and Alstom USA are sufficient to plead a veil-piercing claim under a Rule 8 standard. Plaintiffs have alleged facts sup-

**22.** "Under New York choice of law principles, 'the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) (alterations omitted) (*quoting Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir.1993)). The Court proceeds on the assumption that ATI is incorporated in New York, as it is based in New York and the Court has not identified contrary information in the materials it has. However, if this assumption is incorrect, and the incorrect assumption materially affects the outcome of the determinations made by the Court, the parties may submit further materials to the Court on this issue.

porting their claim of control and dominance of ATI by Alstom and Alstom USA, including the disregard of corporate formalities by Alstom and ATI in suspending Janovec and Rambaud–Measson, Alstom USA's one hundred percent stock ownership of ATI and Alstom's one hundred percent stock ownership of Alstom USA, that ATI and Alstom USA had shared officers, and that Alstom and Alstom USA used this control and dominance of ATI to carry out the ATI Fraud. Though these allegations do not implicate several of the factors outlined above for consideration in veil-piercing analysis, they suffice, if by a narrow margin, to put Alstom and Alstom USA on notice of Plaintiffs' claim, and thus fulfill Rule 8(a)'s requirements at this stage in the litigation. *See Welch Allen, Inc. v. New Image Indus.*, No. 97–CV–240, 1998 WL 238623 at *2 (N.D.N.Y. May 5, 1998) (noting that while the plaintiff may have a weak case for piercing defendant's corporate veil, the pleadings were nonetheless sufficient on a 12(b)(6) motion, and relying on plaintiff's allegations that the parent owned 100 percent of the subsidiary, that the two companies had the same officers, used the same name in their advertising, and parent otherwise controlled the actions of the subsidiary); *but see In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385, 426 (S.D.N.Y.2003) (finding allegations that the bank holding company "exercised such dominion and control over its subsidiaries ... that it is liable according to the law for the acts of such subsidiaries under the facts alleged in this Complaint" and that the card-issuing

defendants were wholly owned subsidiaries of their respective bank holding companies were insufficient to plead veil-piercing theory even under liberal notice pleading standard).[23]

## VII. ALLEGATIONS RELATING TO PREVIOUSLY DISMISSED CLAIMS SHOULD BE STRICKEN FROM THE SECOND AMENDED COMPLAINT

█ The SAC contains many allegations relating to claims and parties the Court dismissed in *Alstom I*, *Alstom II*, and/or *Alstom III*. The Court agrees with Defendants that such claims should be stricken from the SAC pursuant to Federal Rule of Civil Procedure 12(f), as they are immaterial to the currently pending allegations that survived Defendants' initial motion to dismiss, and render an already lengthy complaint all the more unwieldy. Plaintiffs argue that because they are not pursuing any of the dismissed claims and have included them in the SAC only in "an abundance of caution" to preserve their rights for appeal, the question of striking the claims is moot. Plaintiffs' acknowledgment that they are not at this time pursuing these claims does not moot, but rather provides further basis for Defendants' request that the claims be stricken from the SAC. Furthermore, there is no need for Plaintiffs to maintain the allegations in the complaint in order to preserve their rights on appeal. *See P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir.2004) ("As a preliminary issue,

---

**23.** As noted above, Alstom and Alstom USA argue that respondeat superior liability should not be applied to allow a corporate parent to be held liable for the fraud of its subsidiary because this application would circumvent the inquiry into the parent's scienter that is required under by the Second Circuit as set forth in *Chill*, 101 F.3d 263. To the extent that such an argument could also be

raised to the application of a veil-piercing analysis in this context, the Court notes that the Second Circuit did not appear to have occasion to consider this question in *Chill*. The facts of that case, as set forth in that opinion, do not indicate that there was any basis for veil-piercing in that instance, as there were no allegations of control and domination of the subsidiary by the parent.

we must address Smart World's argument that Stolz has waived its § 12(a)(2) claims by not repleading them in the Second Amended Complaint. But this is not our rule. We will not require a party, in an amended complaint, to replead a dismissed claim in order to preserve the right to appeal the dismissal when the court has not granted leave to amend. Such a formalistic requirement serves no valid purpose.") Thus, Plaintiffs are ordered to strike portions of the complaint relating to previously dismissed claims and parties.

## VIII. ORDERS

For the foregoing reasons, it is thereby

**ORDERED** that the motion of Alstom SA and Alstom USA to dismiss [Doc. 165] is DENIED; and it is further

**ORDERED** that the motions of Joseph Janovec and Stephan Rambaud–Measson [Doc. 168 and 181] to dismiss are DE-NIED; and it is further

**ORDERED** that Plaintiffs, the State Universities Retirement System of Illinois, the San Diego City Employees' Retirement System, the Louisiana State Employees' Retirement System, the West Virginia Investment Management Board, and the International Brotherhood of Electrical Workers, Local 269, strike portions of the complaint relating to previously dismissed claims and parties, and it is finally

**ORDERED** that the parties confer and develop a proposed Case Management Plan to govern the schedule of remaining discovery and other pretrial proceedings herein, such agreed upon proposal to be submitted to the Court by October 30, 2006 for review and approval at a conference scheduled for November 17, 2006 at 10:30 a.m., unless prior thereto the parties stipulate that in light of their agreement

on a proposed Case Management Plan there is no need to hold such a conference.

**SO ORDERED.**